IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| SHAUN BONDURANT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | No. 1:04-1278-T-An |
| ) | |
| JERRY VASTBINDER, Individually and ) | |
| in his Official Capacity as the Sheriff of ) | |
| Obion County, Tennessee, ) | |
| ) | |
| Defendant. ) | |

ORDER GRANTING JERRY VASTBINDER'S MOTION TO DISMISS CLAIM TEN
OF THE COMPLAINT

Defendant-Jerry Vastbinder moves, on several grounds, to dismiss the tenth count of Plaintiff Shaun Bondurant's *pro se* complaint seeking damages and injunctive relief pursuant to 42 U.S.C. § 1983.[1]

Shaun Bondurant is an inmate in a Tennessee state penitentiary who previously spent time incarcerated in the Obion County, Tennessee, Detention Center (the "County Jail" or "Jail").[2] On October 10, 2004, Bondurant filed a multi-claim[3] federal civil rights complaint

---

[1] Bondurant has not responded to the motion to dismiss.

[2] This court construes all of the allegations in Bondurant's complaint in his favor, and gives due regard to the fact that he is not an attorney.

[3] Some of Bondurant's claims were dismissed for failure to state a claim after the court's initial screening of the complaint pursuant to the Prison Litigation Reform Act of 1995, 110 Stat. 1321, as amended 42 U.S.C. § 1997e(c).

against, *inter alia*, Defendant-Obion County Sheriff Jerry Vastbinder. The tenth claim contained in Bondurant's complaint challenges the maintenance of what Bondurant describes as the Jail's "'Good Ole Boy'" approach to the assignments of work privileges to inmates. Compl. ¶ 10. According to Bondurant, although the Jail purports to maintain a uniform set of criteria for determining which of the inmates are eligible to receive work assignments,[4] the Jail's unwritten work-assignment policy and its application to individual inmates are discriminatory, irrational, and fundamentally unfair. Specifically, and in contravention of the Jail's allegedly uniform rules, the Jail permits some "ineligible" inmates to receive assignments to work while denying such assignments to other "eligible" inmates. *Id.* Some of the inmates who work are allowed to continue working after committing numerous "infraction[s]," despite the Jail's general rule that one "infraction" at work results in a thirty-day suspension. *Id.*; *see also id.* ("I saw time and time again the same inmates get into trouble then be brought right back to work within days."). Inmates who do not work, either because of their ineligibility or for some other reason, suffer because: (1) they cannot work; (2) their fellow inmate workers are allowed to smoke and to receive other privileges that are not afforded to non-workers; (3) the privilege of working apparently would offset or mitigate the frustration a county inmate experiences while he waits for a transfer to the state prison, where he will begin to receive different or additional credits against his state sentence; and, (4) the option of misbehaving in order to expedite transfer to state prison is not a meaningful

---

[4] To be eligible under the Jail's rules an inmate must have: (1) no history of violent crime; (2) no holds or detainers lodged against him; (3) no history of escape or attempted escape; and, (4) no history of sex offenses. In addition, inmates facing lengthy sentences apparently are ineligible to participate. Compl. ¶ 10.

option for the non-worker because it will result in a sentence-increase.  *Id.*[5]

In a patriotic summary of his complaint, which includes the foregoing claim, Bondurant explains that he wishes "to bring these violations to light," not just for his own sake, "but for the next man too."  *Id.* at 8.  Bondurant continues:

> [E]ven though one is incarcerated, a person still has some rights, and privileges, and shouldn't be treated [in]humane. . . . This is America, and I am proud to be an American! . . . This is what I'm attempting to achieve.  The rights for people to receive what's legal and demanded of by federal laws . . . . [T]o stop the . . . violations . . . that are being committed to many[,] many humans that are incarcerated in Obion County Jail and throughout Tennessee. . . . May God Bless this great country!

*Id.*  Bondurant's tenth claim does not allege that *Bondurant* suffered any actual harm as a result of the Good Ole Boy system while he was housed at the County Jail, or, just how *Bondurant* presently could be suffering any threat of imminent harm as a result of selective treatment in a Jail in which he is no longer incarcerated.  Indeed, it seems clear to the court that, in his tenth claim, Bondurant is simply attempting to voice a generalized grievance against the alleged irrationality of the work-privilege system as a whole, without describing any specific incident when that system caused *him* a concrete, identifiable, and judicially redressable injury.

*Pro se* litigants' complaints generally receive sympathetic judicial interpretations, even when the interpretation arguably affects a basic and fundamental question such as the existence of a justiciable case or controversy.  *See Boswell v. Mayer*, 169 F.3d 384, 387–88

---

[5]The court finds it interesting that Bondurant, in addition to airing the grief of the non-worker, also complains about the burdens imposed on inmates who *are* allowed to work, either because of their technical eligibility or because of the Good Ole Boy system.  *See id.* ("[W]orkers have no access to recreation. [Their] work is their recreation!").  Bondurant does not even state which "class" of inmates he belonged to.

(6th Cir. 1999) (interpreting a *pro se* litigant's complaint to state First Amendment claims even though the litigant had intended to state a claim of denial of access to the courts, where the inmate had standing to assert the former claims but not the latter). But re-phrasing a *pro se* complaint to state the correct legal principle implicated by an actionable set of alleged facts, *see id.* at 387–88, is a judicial task that is a world away from what the court would be required to do here to find that Bondurant has Article III standing to assert claim ten. In *Boswell*, our court of appeals did not entertain any serious doubt that the *pro se* plaintiff did have standing to assert *a* constitutional case based on the facts that he had asserted in the complaint. *Id.* In contrast, here there is good reason to doubt, or at least there is no good reason to believe, that Bondurant has the constitutional standing to state *any* legal claim premised on the court's liberal interpretation of the allegations against the Jail's work-privilege assignments. Reaching the merits of claim ten notwithstanding the standing problem is not an exercise that is somehow mandated by *Boswell* under any arguable reading of that case.

On the contrary, standing is an "irreducible," minimum constitutional prerequisite that must be shown (not taken for granted) at the outset by any litigant—even a *pro se* litigant—seeking to invoke the adjudicating authority of an Article III court. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (citation omitted). This requirement, like other justiciability doctrines, "confines the federal courts to [their role of] adjudicating actual 'cases' and 'controversies'[,]" *Allen v. Wright*, 468 U.S. 737, 750 (1984), thereby preventing those courts

from "undertaking tasks assigned to the political branches," *Lewis v. Casey*, 518 U.S. 343, 349 (1996)—such as the task of determining whether a jail's work-assignment policy is universally "fair" and lawful. In general, to satisfy this minimum burden of Article III standing, a plaintiff need only show: (1) an injury-in-fact, (2) which is fairly traceable to the actions of a defendant, and (3) which will likely be redressed by a favorable judicial outcome. *Coalition for Gov't Procurement v. Fed. Prison Indus.*, 365 F.3d 435, 485 (6th Cir. 2004) (citations omitted). Bondurant's challenge to the Good Ole Boy system fails to show the very first ingredient of constitutional standing.

This conclusion is compelled by the Supreme Court's decision in *Lewis v. Casey, supra*, even though that case arose in a different procedural context and specifically dealt only with an inmate's fundamental due process right of access to the courts.[6] The plaintiff-class in *Lewis* challenged a number of perceived constitutional inadequacies in the Arizona state prison system, including the system's provision of law library staff, legal materials, and photocopying services. 518 U.S. at 346. The Court, however, explained that its previous right-of-access cases had not created any freestanding right of access to adequate law libraries and legal assistance *per se*—the Court instead had always required a showing of individual, "actual injury" to an inmate's constitutional right of access to *the courts*. *Id.* at

---

[6]In *Lewis*, the Court was reviewing the propriety of the scope of a district court's injunctive order mandating systemwide changes in Arizona's prison system. 518 U.S. 343, 348 (1996). The district court had agreed with a plaintiff-class of inmates that Arizona's entire prison system " 'fail[ed] to comply with constitutional standards[]'" requiring meaningful access to the courts, without deciding how many class members had actually been denied access, and the district court therefore ordered systemwide relief. *Id.* at 346 (citing district court's opinion). The Court held the district court's order excessive, but *that* holding was based on the Court's lengthy discussion of the requirements of Article III standing. *Id.* at 349–353.

351 (citing cases and giving examples of actual state interference with the presentation of a legal claim to a court).  Most important for purposes of Bondurant's equal protection claim, the *Lewis* Court did not limit its reasoning to right-of-access cases, but was careful to ground the actual injury requirement as a requirement of Article III standing.  *Id.* at 349.  Referring to its Eighth Amendment jurisprudence as an analogy, the Court observed that if "a healthy inmate who had suffered no deprivation of needed medical treatment were able to claim a violation of his constitutional right to *medical care*, . . . simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would . . . disappear. . . : it would . . . become the function of the courts to assure adequate medical care in prisons."  *Id.* at 350.  In both contexts—right-of-access and adequate medical care—the Court reminded us that:

> It is the role of courts to provide relief to claimants . . ., who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

*Id.* at 349.

The inescapable conclusion that follows from this understanding of Article III standing is that an inmate like Bondurant simply has no such standing to challenge a policy of "unequal work opportunities" in prison or jail, when the inmate has not alleged an actual injury—*i.e.*, no individual discriminatory treatment against *him*.  *Compare id.* at 350 ("[Our cases] established no . . . right [to a law library or to legal assistance], any more than *Estelle* established a right to a prison hospital.").  In other words, Bondurant has no personal stake,

enforceable in a § 1983 case, in enjoining the County's "Good Ole Boy" system, unless Bondurant makes a *prima facie* claim that he has been, or will imminently be, injured by the maintenance of that allegedly unlawful system.

Bondurant would have the federal judicary's principal role become ensuring "fairness" in every written and unwritten policy, program, or privilege administered by a county jail. His essential complaint is that the County Jail maintains an unfair and asymmetrical system of assigning work-privileges and of allocating benefits and burdens between the workers and the non-workers, and that he "saw" such selectivity inflicted by the Jail "time and time again." Compl. ¶ 10. Other than "seeing" such selectivity, however, Bondurant has never claimed to have suffered any actual harm as a consequence. *Lewis*, and the underlying standing requirement, prevent a finding that Bondurant's "seeing" an allegedly unconstitutional system in operation was an actual harm to Bondurant in the Article III sense (otherwise every inmate in the Jail would have standing).

For these reasons, claim ten presents no case or controversy between Bondurant and any defendant, and the claim should be dismissed on that basis without deciding whether Bondurant has stated a facially valid claim that the Good Ole Boy system is unlawful and that Defendant-Vastbinder can be held individually liable for the system's alleged unlawfulness.

Nevertheless, Bondurant's tenth claim fails to state a constitutional claim even if he has standing. A liberal reading of his complaint reveals that he is attempting to state a

violation of the Equal Protection Clause[7] of the Fourteenth Amendment.  *See* U.S. CONST. amend. XIV, § 1.  However, Bondurant has not alleged that the Good Ole Boy system classifies inmates on the basis of membership in a suspect class such as race, *e.g., Johnson v. California*, 543 U.S. 499, 509 (2005) (applying strict scrutiny); thus, to survive Vastbinder's motion to dismiss, Bondurant must have pleaded that he was treated differently from similarly situated inmates incarcerated at the County Jail and that the disparate treatment was not " 'reasonably related to legitimate penological interests,'" *Toms v. Taft*, 338 F.3d 519, 525 (6th Cir. 2003) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  Bondurant has failed to allege that the Jail's frequent deviation from absolute, uniform rules in individual work-assignment situations was not reasonably related to legitimate penological interests, and nothing in the complaint permits that inference.

Finally, as Vastbinder points out, Bondurant does not make any specific allegations about Vastbinder's role in the Good Ole Boy system.  To state a § 1983 claim against Vastbinder, in Vastbinder's individual capacity, Bondurant was required to plead that Vastbinder had some direct, personal involvement in the allegedly discriminatory system. *See Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  His mere supervisory status as the Sheriff of Obion County is not an adequate basis upon which to impose individual

---

[7]Because Bondurant is attempting to state a violation of the Equal Protection clause, rather than a violation of procedural due process, the validity of his claim against the Good Ole Boy system is not dependent upon whether the deprivation of work-privileges constitutes an "atypical and significant hardship."  *But see* Def.'s Mem. at 3 (relying on *Sandin v. Conner*, 515 U.S. 472 (1995) and progeny).

liability.  *See, e.g., Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).[8]

Jerry Vastbinder's Motion to Dismiss Claim Ten of the Complaint (dkt. # 12) is GRANTED.

IT IS SO ORDERED.

   s/ **James D. Todd**
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

---

[8] Although Bondurant has also sued Vastbinder in Vastbinder's capacity as Sheriff—*i.e.*, Bondurant has sued Obion County—the court's ruling on standing and failure to state a claim disposes of the official capacity claim as well.